IN

# THE SUPREME COURT

OF

# PENNSYLVANIA.

NORTHERN DISTRICT—SUNBURY 1851.

## Ross *versus* Pleasants.

1. If a settler on land omit to have his claim designated by warrant and survey within seven years after the commencement of his settlement, his claim will be limited to the extent of his actual occupancy and improvement, as against one claiming by warrant and survey subsequent to the commencement of the improvement.

2. The claim of a father by settlement being, for want of a warrant and survey, limited to the part occupied by him, his children remaining on the land after his death are not estopped from defending their possession of the land beyond the part actually occupied by their father, under another title, as against the plaintiff who claimed under one to whom the father had conveyed the half of the tract on which the father had made an improvement.

3. A plaintiff in whose favor a verdict in ejectment was rendered may maintain a second ejectment for the same land without taking possession or issuing process for that purpose under his first ejectment, provided oppression be not intended. See Rambler v. Tryon, 7 *Ser. & R.* 95–6.

4. The plaintiff in an action of *partition*, in which *a verdict* was rendered against him, may, during the pendency of such action, and after verdict therein against him, maintain ejectment for the moiety of the same land. Partition does not affect *the title* to the land, but operates merely as to the lines of division.

ERROR to the Common Pleas of *Northumberland county.*

This was an action of ejectment by Charles Pleasants against James and William Ross, to recover the possession of the undivided half part of a tract of land in Augusta township, Northumberland county.

O                                                                (157)

[Ross *v.* Pleasants.]

Hugh Bellas alleged that he was the owner of the undivided half part of a certain tract of land, situate in Augusta township, Northumberland county, containing about 58 acres, in the possession of James and William Ross.   On the 27th of January, 1845, Bellas, for the consideration of $40, conveyed his interest in said tract of land to Charles Pleasants, who brought an action of ejectment against the Rosses to April Term, 1845, and on the 12th of November, 1845, a verdict was rendered in favor of *plaintiff* for the undivided half part of said tract of land.   Judgment was entered on the verdict.   The defendants sued out a writ of error, and at July Term, 1846, the judgment was affirmed : see 3 *Barr* 408.   Pleasants did not take out a writ of *hab. fac. possessionem*, or in any way take possession of the property ; but he brought an action *of partition* against James and William Ross, which was tried in January 1848, and on the 15th of that month a verdict was rendered for plaintiff, and judgment *quod partitio fiat* directed.   Defendants sued out a writ of error, and at July Term, 1849, the judgment was reversed.   The cause was tried again at January Term, 1850, and on the 17th of that month, a verdict was rendered in favor *of defendants. .* To November Term, 1849, while said action of partition was pending, Pleasants brought this action of ejectment, not having taken possession under his former judgment.   On 12th April, 1850, verdict was rendered for the plaintiff for the undivided half of the land actually occupied by William Ross, the father of the defendants, who claimed by settlement and improvement.

See the report of the case in 3 *Barr* 408, &c., and the statement in the charge of ANTHONY, J., in this case.

ANTHONY, President Judge, April 12, 1850, charged the jury as follows :—

"This is an ejectment brought by Charles Pleasants *v.* James Ross and William Ross, for 58 acres of land in Augusta township, bounded by land of Jacob Rhoads, lands in the name of Robert Phillips, by a survey in name of John Kidd, lands in the name of William and Nicholas Shipman, and other lands.   The writ of ejectment was served on defendants on the 11th August, 1849, and they have pleaded not guilty.

" The plaintiff in this case, although he has brought his ejectment for the whole of the 58 acres, only claims the undivided moiety or half part of 57 acres and 122 perches, by virtue of a survey of the land made on the 12th of January, 1831.   It .appears from the evidence, that at an early day, perhaps as early as 1808 or 1810, old William Ross went upon this land, put up a cabin, and cleared about ¾ of an acre.   Daniel Micum, according to the testimony of some of the witnesses, made the first clearing upon the land, and old William Ross went into possession shortly afterwards, and remained in possession until about the year 1824 or 1825, when

he died; as on the 19th of April, 1825, his death was suggested, and his son Augustavius substituted in his stead as defendant in an ejectment of Benjamin Williams *v.* William Ross. During the lifetime of old William Ross he remained in the undisturbed possession and occupancy of the land, having a small cabin thereon, and having cleared altogether about one or two acres, until the year 1822, when Benjamin Williams brought an ejectment against him to August Term, and the old man employed Hugh Bellas, Esq., as his counsel and attorney to defend the ejectment; and on the 22d of March, 1822, for the consideration of one dollar, William Ross conveyed to Bellas the one moiety or half part of the tract of land on which he then lived. In the year 1823, Bellas tried the ejectment before arbitrators; an award was made in favor of Williams, and it became necessary to appeal and pay the costs in order to have a trial in Court. The appeal was made, and as Ross was poor, Bellas paid the costs to the prothonotary, for the purpose of obtaining the appeal. After the death of Ross, his wife and children continued in possession of the land, and some of them still reside there. In 1825, the case was tried in Court by Bellas, as attorney, and verdict and judgment were rendered in favor of the defendant, Augustavius Ross, who had been substituted as defendant in place of his father.

"On the 9th of August, 1830, Augustavius Ross and Hugh Bellas, entered into an agreement to take out in Ross's name a warrant for the old improvement commenced by William Ross, and continued by his widow and children. One-half of the land was to belong to the heirs of Wm. Ross on their paying one-half of all the purchase-money and expenses respecting the title, and the other half to belong to Hugh Bellas.

"Pursuant to this agreement, on the 14th of August, 1830, Bellas paid the purchase-money and fees, and took out a warrant in the name of Augustavius Ross, for 50 acres, to adjoin Phillips and Shipman, including the improvement of Ross. Interest to commence on the 1st of March, 1808, going back to the date of the commencement of the improvement. This warrant was placed in the hands of deputy surveyor Laird, who made a survey thereon on the 12th January, 1831, of 57 acres 122 perches; but by some neglect the survey does not appear to have been returned into the land office till August 11, 1846, when Laird, having gone out of office, and Abraham Shipman being deputy surveyor, he was employed by Bellas, and having found the draft of the survey made by Laird in the deputy surveyor's office, went upon the land, found the marks of the survey made by Laird, and on the 11th August, 1846, returned the survey of 57 acres 122 perches into the land office.

"On the 30th January, 1845, an ejectment was brought by Charles Pleasants, to whom H. Bellas made a deed for this land

on the 27th January, 1845, against James Ross, William Ross, Augustavius Ross, and Mary Farnsworth, for the undivided moiety or half part of the land; and on trial, after a disclaimer filed by Augustavius Ross and Mary Farnsworth, the plaintiff recovered a verdict and judgment on the 12th November, 1845, against James Ross and William Ross (the present defendants), which judgment has been affirmed by the Supreme Court, and is persuasive evidence of the plaintiff's title to the moiety of the land for which the ejectment was brought, and the jury will give it such weight as, under all the circumstances connected with the trial of that cause, it deserves.

" The plaintiff has also shown that on the 30th March, 1850, he employed Abraham Shipman to go upon the ground, and make a survey of that part which contains the old improvement made by old William Ross prior to 1817. Mr. Shipman has made a diagram of the survey made by him, and in case it becomes necessary to ascertain the boundaries and extent of the old improvement, the jury will take into consideration how much land was claimed and cultivated or enclosed, before the year 1817, when the re-survey was made.

" *The defendants* have shown in evidence a warrant to *Daniel Levy* for 400 acres, adjoining John Kidd, dated 5th December, 1793, and a survey thereon dated 17th November, 1794, for 401 acres, which survey was not accepted by the Surveyor-General, as it included an improvement of Ryerson, who should have had notice, so that he could make his objection to the survey, if any he had. This survey thus made does not include any of the land in controversy, according to the testimony of David Rockefeller. But as the original survey was not accepted, application was made by Wm. Maghee to the board of property on the 31st of January, 1816, for an order of re-survey, which was granted by the board; and in pursuance thereof, on the 27th October, 1817, a re-survey was made and returned into the land office, excluding Ryerson's improvement, containing 349 acres 67 perches. The re-survey thus made includes about 110 acres or more of land, not included in the original survey, and comprehends within it *the whole of the* 57 *acres* 122 *perches in controversy.* On the 21st August, 1830, a patent was granted to Robert Phillips, for the 349 acres 67 perches, and in addition thereto, 76 acres 22 perches, included in another survey adjoining this land. On the 20th May, 1835, a judgment was obtained for $250.37 against Robert Phillips, in favor of George McClelland, on which a *fi. fa.* was issued, and a certain patented tract of land, containing 200 acres, *more or less*, in the patentee name of Robert Phillips, was levied on, and subsequently sold by the sheriff of Northumberland county to William Silverwood for $270. A deed was made to him by the sheriff, and acknowledged 15th April, 1836. On the

[Ross v. Pleasants.]

7th January, 1836, William Silverwood, in consideration of $275, agreed to sell the land *to Augustavius Ross.* This was on the same day that the property was knocked down by the sheriff to Wm. Silverwood. It is also in evidence that Ross paid Silverwood a part of the purchase-money of this land.

"*Defendant* has also shown in evidence a warrant *to John Kidd,* for 400 acres, dated 5th December, 1793, adjoining Daniel Smith and others; and a survey thereon, dated 17th November, 1794, adjoining Daniel Smith, Daniel Levy, Jacob Waggoner, and others. This tract of John Kidd purports to adjoin the original survey of Daniel Levy, and Rockefeller says he believes *they are both chamber surveys,* that is, surveys returned by the deputy-surveyor without going upon the ground and marking the lines and corners; and from the return, it appears there was no vacant land where this settlement of old Wm. Ross was made, *if these old surveys were actually subsisting at the time of the settlement.*

"It also appears that Bellas obtained a judgment on the 28th October, 1841, against Augustavius Ross, and afterwards levied on the interest of Ross, in the 200 acres, more or less; and on the 13th August, 1844, it was sold by the sheriff, and deed made to William Ross, one of the defendants. Executions have also been issued by Bellas, to recover from William Ross the costs in the ejectment brought by him against Ross; but the records do not show that the moneys were actually paid, though Philip Renn, the father-in-law of one of the defendants, says that Bellas paid him his costs in the Williams case, and said he had got the costs. Evidence has also been given by the defendants, that where the barn now stands was not cleared in the lifetime of old Wm. Ross; but it is included in the diagram of Abm. Shipman. As rebutting evidence, Daniel Rufaner testifies that the family recognised the right of Bellas to a moiety of the land some ten or twelve years ago, during the lifetime of the old woman. His testimony is for the consideration of the jury. The record of the former suit of ejectment and suit of partition, and the charges of the Court thereon, are also in evidence, showing alternate decisions for the respective parties. The jury will give them such weight as you may think they merit. Neither of them, in the opinion of the Court, is *conclusive* evidence, so as to prevent a careful examination of the merits of the present controversy.

On the part of the plaintiff various points were proposed, the *sixth* of which was as follows:

That the Levy and Kidd surveys being *chamber surveys,* if the evidence in that respect is believed, and Ross's settlement having been made before twenty-one years had elapsed from their return into the land office, the defendants cannot by those surveys resist the plaintiff's recovery, especially as they show no title under Kidd, and as this is not a subsisting title.

This point was answered in the affirmative.

On the part of the *defendants* points were also proposed, the first, second, third, seventh, and eighth of which were as follows :

1st. That inasmuch as the plaintiff has shown that he brought an action of ejectment to April Term, No. 13, 1845, for the same tract of land now in dispute, against the same defendant, and on 12th November, 1845, obtained a verdict and judgment, which was affirmed by the Supreme Court, on the — day of February, 1846, and that he did not take out a writ of *habere facias possessionem*, and the evidence shows he never took possession of the land so recovered ; therefore plaintiff is not entitled to recover in this action, even if the Court and jury should believe that he has shown a valid title to the land in dispute, or any part of it.

2d. That if the jury believe that the survey of Augustavius Ross is located within the boundaries of the survey or re-survey of Daniel Levy, or the survey of John Kidd, given in evidence, then the warrant and survey in the name of Augustavius Ross gives no title to the land in dispute, or any part of it.

3d. That if the jury should believe from the evidence that the surveys of Daniel Levy and John Kidd, made the 17th November, 1794, were *chamber surveys*, and that William Ross entered as an improver on a portion of the land included or embraced in either of these surveys, prior to 1808, or thereabouts, and that no application was made by William Ross, or those claiming under him, to the Land Office for upwards of twenty-one years after the surveys of Levy and Kidd, then these surveys (of Kidd and Levy) are as good and valid in law as if they had been actually made upon the ground, and therefore hold the land in dispute.

7th. That the record of the proceedings, in the action of partition between the same parties, for the same land, given in evidence by defendants, is a positive bar to plaintiff's recovery.

8th. That under the evidence in this case the plaintiff is not entitled to recover.

The 1st point of defendant the Court answered in the negative : 7 *Ser. & R.* 90, Rambler *v.* Tryon.

To the 2d and 3d points, the Court answered : That according to the testimony of David Rockefeller, which is uncontradicted, the re-survey of Daniel Levy includes all the 57 acres 122 perches, with the survey in the name of Augustavius Ross. By the returns of Daniel Levy and John Kidd, they appear to have been made on the 19th November, 1794. But Rockefeller believes them to have been originally *chamber surveys*. At what time they were returned into the office of the Surveyor-General does not appear. The *Daniel Levy* survey was rejected, because it included the Ryerson improvement. John Kidd is called for in the return of the re-survey of Daniel Levy, in 1817, and in the survey of Augus-

[Ross *v.* Pleasants.]

tavius Ross, made in January, 1850. An order of the Board of Property was issued on the 31st January, 1816, for a re-survey of Daniel Levy, so as to exclude the Ryerson improvement. On the 27th October, 1817, a re-survey of Daniel Levy was made, including 349 acres 67 perches, and including 110 acres beyond the former lines of Daniel Levy (if any were made), and taking in the improvement of William Ross, covering the 57 acres and 122 perches afterwards surveyed, on warrant, to Augustavius Ross, including that improvement. Now, as the lines and boundaries of John Kidd have not been ascertained on the ground, and as defendants do not claim under John Kidd as a subsisting title, nor has any person claimed under that title, we are of opinion that as the re-survey of Daniel Levy was made of 27th October, 1817, and was duly returned into the office of the Surveyor-General and accepted, and a patent was granted thereon on the 21st October, 1830, being previous to the survey of Augustavius Ross, and no marks or boundaries affixed to Ross's improvement, and the survey thereon not being returned into the land office until the 11th August, 1846, this re-survey thus made, although it included the old improvement of William Ross, will hold the land included in the Augustavius Ross survey, except so much thereof as was actually enclosed, or cleared and cultivated, when the re-survey was made as aforesaid.

The 7th point the Court answered in the negative. Although the Supreme Court, when the action of partition was before them, strongly intimate that after a *judgment* in partition, a second ejectment cannot be sustained, yet that Court has not decided that a *verdict* in partition has that effect before judgment is entered upon it.

To the 8th point the Court refused to give the instruction prayed for, and left the facts to the jury to be decided by them.

Error was assigned, *inter alia*, to the answers to the *plaintiff's sixth* point, and to the answers to the first, third, seventh, and eighth points submitted on part of *defendants.*

*Donnel* and *Miller* for plaintiffs in error.
*Jordan* and *Pleasants* for defendant in error.

The opinion of the Court was delivered, August 1, 1851, by

BELL, J.—Numerous points were made on the trial of this cause, and most of them have been zealously and elaborately argued here. But, after all, the contest, properly regarded, is reducible to the single inquiry whether William Ross, the elder, at the time of his death, had an interest amounting to estate, beyond the small patch of land actually cleared and cultivated by him. If he had not, it is clear Hugh Bellas and those claiming

under him, cannot claim beyond the limits of that possession, for he could take, under his agreement of 1822 with Ross, no more land than the latter could legitimately claim to be the owner of, at the moment of his decease.   This position is not controverted, and, accordingly, an effort is made to show that, before that event, Ross might fairly ask to be recognised as the proprietor of the whole tract of 57 acres 122 perches, the subject of this ejectment, at least so far as ownership was necessary to enable him to transmit a recoverable title to Mr. Bellas.   This attempt has, however, been unattended by success.   It is shown that he entered upon the land in question about the year 1811 or '12, without a pretence of title.   At that time an improvement had been commenced by one Micum, Ross's brother-in-law.   He seems to have relinquished it to the latter, who, after taking possession, extended the clearing somewhat, built a small house upon it, in which he lived with his family, and put up some other buildings.   He died in the year 1825, at which time there was cleared and subjected to tillage from three-fourths to an acre of ground.   During this interval of thirteen or fourteen years, he had never sought to purchase a title from the Commonwealth, nor in any way to indicate the extent of his claim.   He caused no survey to be made, marked no lines in the woods surrounding his clearing, paid no taxes for any ascertained number of acres, nor took any other step which, in the most remote manner, could serve to manifest an intention to extend his possession beyond the frail fences and rough stone heaps by which he surrounded his limited enclosure, and marked its boundary. Up to the moment of his death, he seems to have rested entirely content in the enjoyment of the very scanty portion of earth he had rescued from the surrounding forest, without dreaming of pushing his claim as an improver further or faster than the slow labors of his axe, from day to day, cleared the ground for the action of the plough.   After his decease, his widow and some of the children, most of whom were minors, continued to reside upon the little patch of cleared surface he had left as the result of his labors.   Under their industry, it continued to extend itself, until the year 1830, when it amounted to about 2 acres.   In August of that year, a warrant to survey 50 acres was procured by Augustavius Ross, the eldest son, in pursuance of his prior agreement with Bellas, under which a survey was made of 57 acres and 122 perches, in January 1831, but this survey was not returned into the land office until August 1846.   In the mean time, however, the defendants, William and James Ross, seem to have had possession of the tract now in dispute, including the improvement, but they disclaim this warrant and survey as the source of their title. They seek to protect their possession by virtue of certain outstanding titles, originating in warrants of survey, issued in the respective names of Daniel Levy and John Kidd, dated December

[Ross v. Pleasants.]

15, 1793. It is conceded the chamber surveys returned under these warrants, during the succeeding year, were ineffective to create title. Besides this, the Daniel Levy survey was rejected by the officers of the Commonwealth, as improperly covering a certain improvement made by one Ryerson. But in 1817, another survey under the latter warrant was made and returned, in pursuance of an order obtained from the board of property, which it is admitted covers the land here in question. This title seems to have been consummated in 1830, by a patent granted to Robert Philips, who then claimed to be the owner of the survey. A portion of the tract was afterwards sold as his property, under judicial process, and purchased by Augustavius, James, and William Ross, but whether this purchase includes the land in question is left in some doubt. This, however, in the view I take of the controversy, is of little consequence. Notwithstanding the various objections made against the validity of the proceedings had under the Levy warrant, as a source of title, I have no hesitancy in pronouncing it entirely sufficient as between the present parties, unless, at the time of the second survey, William Ross had acquired some antagonist title or available claim to the woodland not included within his fences, or there be some other outstanding title of sufficient potency to thrust aside the survey of 1817, and the subsequent conveyances consequent upon it. It will be convenient, first, to inquire whether, at or before the date of that survey, William Ross was vested with an interest beyond his clearing, which amounted to an estate, or might, thereafter, be made the inception of one? In connection with this question, the most favorable character in which he could demand to be regarded was that of an improver, clothed with the inchoate right to perfect a title to 300 acres, located in a reasonable and convenient shape around his improvement. In the Farmers' and Mechanics' Bank v. Woods, 1 *Jones* 99, we had occasion to investigate the nature of this right, and the extent of privilege it confers upon the settler. And it was there shown, that both reason and authority require the right to be prosecuted within a reasonable period, in default of which the settler is liable to be postponed to those claiming by warrant and survey, of a date posterior to the commencement of the settlement. By analogy to the rule which works a presumptive abandonment of a survey, if not returned within seven years, the latter period was proclaimed as the measure of the reasonable time allowed a settler to indicate the extent of his possessions, dependent on his improvement, and to mark his boundaries, under the penalty of a forfeiture of privilege, when interfered with by a younger survey. It is unnecessary here to repeat the reasoning which led to this conclusion, further than to say it is founded in the obvious impolicy of permitting the representative of what has been properly denominated a mere claim to favor, to hold the state bound for an

[Ross *v.* Pleasants.]

indefinite time, and keep the world at bay, while he is left at liberty to claim or reject the surrounding land, at pleasure. Measured by this test, it will be perceived the elder Ross had forfeited the privilege of extending his dominion over the land in suit, long before the period of his decease. Counting from the commencement of his settlement, more than twice the allowed period for action had run by, and this time had been more than quintupled ere those who claimed to have succeeded him procured a survey of the extended boundary to be made and returned. But long before this, the survey of 1817 had attached upon the land, and by legally appropriating it to another, excluded the extension of the settler's claim in that direction. It is insisted, however, that such an effect cannot, properly, be accorded to this survey, because, in point of time, it was preceded by the Kidd survey, which originally covered the land in controversy, and which, though in its inception defective from absence of actual survey, was yet cured by lapse of time, so early as the year 1815. This position is more than doubtful, under the circumstances that have had place. But conceding it to be tenable, its effect is but to substitute the Kidd survey for the Levy title, the former operating in the same way, to hedge in the unexercised privilege of the settler after the lapse of time which occurred here. To this view, it is objected that the present defendants derive their possession of every portion of the survey through their father, whereby they became tenants in common with his vendee, wherefore they ought to be precluded from setting up the Kidd title, or indeed any other, in bar of the vendee, at least before letting him into possession as a tenant in common. The rule of policy which prohibits an occupier from denying the title under which his occupancy began, has been urged upon us as strictly applicable here, and we are, accordingly, called on to estop the defendants from averring title, other than that it is supposed their father transmitted to them by descent. But the answer is, that of the land, uncovered by the verdict in this case, the father had neither possession nor right of possession, at the time of his death. As I have shown, he never, at any single moment of time, had the slightest hold upon it, either actually or constructively. As he never was in possession of it, it is impossible he should have transmitted it to his posterity, and it necessarily follows that, if any of these are in the occupancy of it, they must have acquired it otherwise than through him. Until 1831 no step had been taken to vest this family with any show of title depending on the original clearing, and then it was much too late for any efficient step. The misconception I have noticed, seems to have led to many of the erroneous views entertained by the plaintiff, and the moment it is brushed away, many of the difficulties suggested as lying in the way of the defence are removed. The objection founded upon the supposed

[Ross v. Pleasants.]

derivative possession of the sons, is, in fact, applicable only to that portion of the land of which the father had actual possession, and to this extent, advantage of it has been rightly afforded to the plaintiff.  Beyond that it is valueless.  I may add, on this part of the case, my concurrence with the remarks of the Court below, that as the supposed boundaries of the Kidd survey remain undiscovered on the ground, and the survey is, itself, unclaimed by any one as the foundation of title, it cannot be set up as conflicting with the re-survey of Levy, duly made, returned, and accepted, long prior to the survey made under the Ross warrant, which latter survey was the first attempt to designate the boundaries claimed under the settlement.  The observation that "this re-survey, thus made, although it included the old improvement of William Ross, will hold the land covered by the Augustavius Ross survey, except so much thereof as was enclosed, or cleared and cultivated, when the re-survey was made," is quite correct.  Indeed, all that was said by the Court below, in answer to the defendant's second and third points, commands our assent, and this, it is believed, covers all that is vital in the dispute.

To the view taken of the relative rights of the parties, I perceive nothing hostile in the fact, that before William Ross came into possession of the clearing, David and Joseph Micum appear to have been assessed for taxation, as the owners or occupiers of a certain number of acres, ranging from 100 to 73, commencing in the year 1807 and ending in 1809.  If this assessment related to the land in dispute, it is clear it was disclaimed by Ross, after he became possessed of the improvement, for from that time forward, there is no trace of any tax assessed upon him, as owner of land within the county.  Admitting the Micums to have been charged as owners or occupiers of the improvement, and claimants of the adjacent woodland, the fact that the practice was dropped when Ross became occupier, would seem to establish that he disclaimed any pretence of title or ownership beyond the bounds of his clearing.  If, then, any effect is to be allowed to the previous assessments, it would be adverse to the claim now set up, resting in a supposed, but unproved intention to appropriate 50 acres as the appendage of the improvement.

From this reasoning it is apparent that Ross, at his death, could claim only the ownership of so much of the land as was cleared and in his actual possession; and of this, as I understand, the plaintiff below has been permitted to recover a moiety.  Under this conclusion, he does not insist upon his bills of exceptions to evidence, as a reversal of the judgment upon minor points would be of no service to him.  It is therefore unnecessary to consider them.

The remaining objections made by the defendants below as

[*Ross v. Pleasants.*]

plaintiffs in error here, may be disposed of in a few words.   The first of these is, that a second ejectment will not lie for a successful plaintiff, before he has taken or attempted to take possession under the first verdict.   It is enough to say this position is disproved by the decision in Rambler *v.* Tryon, 7 *Ser. & R.* 90, provided oppression be not intended.

Nor is the idea, that a verdict in an action of partition is conclusive of the title, better founded.   It is settled, that partition operates merely on the lines of division, leaving the title unaffected.   Where, therefore, partition is not followed by actual occupancy of the purpart, or the verdict is adverse to the demandant, there is nothing to bar a subsequent ejectment to try a disputed title: (Goundie *v.* Northampton Water Company, 7 *Barr* 233–38; Bellas et al. *v.* Graham, decided at Sunbury, July 1850, but not yet reported.)   There is nothing in the four bills of exception to evidence, taken by the defendant below, and insisted on here, which calls for particular remark.   Indeed, the views we have taken of the controversy render them wholly unimportant.

Judgment affirmed.